UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TERRELL LEE McCART,<br><br>          Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>          Defendant. | No. 1:16-CV-3146-LRS<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,** *INTER ALIA* |

**BEFORE THE COURT** are the Plaintiff's Motion For Summary Judgment (ECF No. 13) and the Defendant's Motion For Summary Judgment (ECF No. 14).

## JURISDICTION

Terrell Lee McCart, Plaintiff, applied for Title II Disability Insurance benefits (SSDI) and Title XVI Supplemental Security Income benefits (SSI) on June 12, 2009. The applications were denied initially and on reconsideration. Plaintiff timely requested a hearing. Two hearings were held before Administrative Law Judge (ALJ) Caroline Siderius, one on September 9, 2011, and a supplemental hearing on February 29, 2012. On March 28, 2012, ALJ Siderius issued a decision finding the Plaintiff not disabled, however, the Appeals Council subsequently granted a request for review and remanded the case for further development of the record.

On June 12, 2014, a hearing was held before ALJ Larry Kennedy. Plaintiff testified at the hearing, as did Vocational Expert (VE) Kimberly Mullinax. On

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT- 1**

October 31, 2014, the ALJ issued a decision finding the Plaintiff not disabled. The Appeals Council denied a request for review of the ALJ's decision, making that decision the Commissioner's final decision subject to judicial review. The Commissioner's final decision is appealable to district court pursuant to 42 U.S.C. §405(g) and §1383(c)(3).

## STATEMENT OF FACTS

The facts have been presented in the administrative transcript, the ALJ's decision, the Plaintiff's and Defendant's briefs, and will only be summarized here. At the time of the June 12, 2014 administrative hearing, Plaintiff was 55 years old. He has past relevant work experience as a laborer, security guard, dump truck driver, flagger, construction worker, industrial truck operator, and deliverer. Plaintiff alleges disability since April 7, 2009, on which date he was 50 years old. His date last insured for Title II benefits was December 31, 2009.

## STANDARD OF REVIEW

"The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence...." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983). Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance. *McAllister v. Sullivan*, 888 F.2d 599, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. *Beane v. Richardson*, 457 F.2d 758, 759 (9th Cir. 1972); *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965).

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 2**

On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989); *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir. 1982).

It is the role of the trier of fact, not this court to resolve conflicts in evidence. *Richardson*, 402 U.S. at 400. If evidence supports more than one rational interpretation, the court must uphold the decision of the ALJ. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

A decision supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making the decision. *Brawner v. Secretary of Health and Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

## ISSUES

Plaintiff argues the ALJ erred in: 1) evaluating the medical opinions of record; and 2) posing an incomplete hypothetical to the VE.

## DISCUSSION

**SEQUENTIAL EVALUATION PROCESS**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act also provides that a claimant shall be determined to be under a disability only if his impairments are of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education and work experiences, engage in any other substantial gainful work which exists in the national economy. *Id*.

The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. §§ 404.1520 and 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S.Ct. 2287 (1987). Step one determines if he is engaged in substantial gainful activities. If he is, benefits are denied. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). If he is not, the decision-maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); 20 C.F.R. § 404 Subpart P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step which determines whether the impairment prevents the claimant from performing work he has performed in the past. If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). If the claimant cannot perform this work, the fifth and final step in the process determines whether he is able to perform other work in the national economy in view of his age, education and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v).

The initial burden of proof rests upon the claimant to establish a prima facie case of entitlement to disability benefits. *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). The initial burden is met once a claimant establishes that a physical or mental impairment prevents him from engaging in his previous occupation. The burden then shifts to the Commissioner to show (1) that the claimant can perform

other substantial gainful activity and (2) that a "significant number of jobs exist in the national economy" which claimant can perform. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

**ALJ'S FINDINGS**

The ALJ found the following:

1) Plaintiff has "severe" medical impairments, those being: lumbar degenerative disc disease; cervical strain; degenerative joint disease of the bilateral knees; chronic obstructive pulmonary disease (COPD); affective disorder (depression); anxiety disorder; and drug and alcohol use disorder;

2) Plaintiff's impairments do not meet or equal any of the impairments listed in 20 C.F.R. § 404 Subpart P, App. 1;

3) Plaintiff has the physical residual functional capacity (RFC) to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) with the caveat that: he can frequently handle and finger with the right upper extremity; he can occasionally balance, stoop, kneel and crouch; he should avoid crawling, climbing ladders, ropes, scaffolds and stairs; he should avoid concentrated exposure to vibrations, fumes, odors, gases, poor ventilation and hazards;

4) With regard to mental RFC, the Plaintiff can understand, remember, and carry out simple and some detailed instructions; he can make judgments on simple and some detailed work-related decisions; he could perform sustained work activities in an ordinary work setting on a regular and continuing basis within customary tolerances of employers' rules regarding sick leave and absence; he requires a work environment with minimal supervisor contact; he can work in proximity to coworkers, but not in a cooperative or team effort; he requires a work environment where there is no more than superficial interaction with a few coworkers; he can have simple and

///

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 5**

superficial exchanges with the general public, but he cannot engage in complex or demanding social exchanges;

5) Plaintiff's RFC allows him to perform his past relevant work as a dump truck driver, tow truck driver, and outside deliverer;

6) Alternatively, it allows him to perform other jobs existing in significant numbers in the national economy as identified by the VE, including laundry worker and merchandise deliverer.

Accordingly, the ALJ concluded the Plaintiff is not disabled.

**OPINIONS OF MEDICAL SOURCES**

It is settled law in the Ninth Circuit that in a disability proceeding, the opinion of a licensed treating or examining physician or psychologist is given special weight because of his/her familiarity with the claimant and his/her condition. If the treating or examining physician's or psychologist's opinion is not contradicted, it can be rejected only for clear and convincing reasons. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). If contradicted, the ALJ may reject the opinion if specific, legitimate reasons that are supported by substantial evidence are given. *Id*. "[W]hen evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

Nurse practitioners, physicians' assistants, and therapists (physical and mental health) are not "acceptable medical sources" for the purpose of establishing if a claimant has a medically determinable impairment. 20 C.F.R. §§ 404.1513(a) and 416.913(a). Their opinions are, however, relevant to show the severity of an impairment and how it affects a claimant's ability to work. 20 C.F.R. §§ 404.1513(d) and 416.913(d). An ALJ can reject opinions from these "other source[s]" by

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT- 6**

providing "germane" reasons for doing so. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010).

### A. Charles Forster, M.D.

Plaintiff resumed seeing Dr. Forster at the Yakima Farm Workers Clinic in September 2008, after a six year absence. Plaintiff complained of chronic back pain. He rated his pain as 6 on a scale of 1 to 10. Palpation of the mid-thoracic spine, where Plaintiff said he had the most discomfort, revealed some muscular tenderness, but no gross bony tenderness. Plaintiff was able to perform straight leg raising to about 80 degrees bilaterally with minimal discomfort. Deep tendon reflexes were trace and symmetric at the knee. Dr. Forster specifically informed Plaintiff that "narcotic pain medication [was] not an option for this chronic pain syndrome." (AR at p. 214).

Plaintiff returned to see Dr. Forster in November 2008, requesting the doctor complete a physical evaluation form from the Washington Department of Social Health Services (DSHS). Plaintiff told the doctor he could not "do any significant physical labor due to some chronic back pain and chronic spinal abnormalities," and that any lifting, bending, stooping or prolonged standing caused him to develop worsening pain. On exam, the Plaintiff was in no distress. He was capable of straight leg raising to 80-90 degrees bilaterally "without significant low back pain." As to Plaintiff's gait, Dr. Forster reported that Plaintiff walked with a slight limp, "but gets up and off the table easily and walks easily in the hallway otherwise." (AR at p. 216). On the DSHS evaluation form, Dr. Forster rated Plaintiff's chronic low back pain as a "moderate" impairment which caused "[s]ignificant interference with his ability to perform one or more basic work-related activities." He opined that Plaintiff was limited to "sedentary" work, defined as the ability to lift 10 pounds maximum and

///

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT- 7**

frequently lift or carry such articles as files and small tools, and perhaps requiring sitting, walking and standing for brief periods. (AR at p. 220).

Plaintiff saw Dr. Forster again in March 2009 for "ongoing chronic low back pain secondary to lumbosacral degenerative disease that has been documented before with a previous MRI." On exam, the Plaintiff was in no distress. Dr. Forster prescribed 30 tablets of Vicodin for the Plaintiff to take when his back pain was bad, but emphasized this was the only prescription he was going to give for Vicodin and that Plaintiff's medication would in the future be managed by a specialist at the pain clinic. (AR at p. 224).

In April 2009, Plaintiff saw Dr. Forster, one of the purposes of which was to have him fill out another disability form. The doctor informed Plaintiff that "ideally the pain clinic doctors would be filling that out since they will be doing the imaging studies and reviewing those . . . ." (AR at p. 228). Nevertheless, one month later, Plaintiff returned to ask Dr. Forster to complete the DSHS disability evaluation form, and Dr. Forster did so, although he emphasized that any future forms would have to be completed by a pain specialist at the pain clinic "as his disability that apparently prevents him from work is his chronic back pain." Dr. Forster noted he had reviewed the assessment of Dr. Kim at the pain clinic which pointed out that Plaintiff had tested positive for methamphetamine and marijuana, and if this was confirmed with additional testing, all narcotic pain medication would be discontinued. Dr. Forster indicated that Plaintiff was attempting to get pain medication from him, even though the note from the pain clinic clearly indicated the clinic was responsible for prescribing any medication. (AR at p. 232). On the May 2009 form, Dr. Forster once again labeled Plaintiff's chronic back pain as a "moderate" impairment and opined that he was limited to "sedentary" work. (AR at p. 236).

The ALJ accorded little weight to Dr. Forster's November 2008 and May 2009 opinions. One of the reasons was that the doctor's unremarkable examination

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 8**

findings did not support a limitation to "sedentary" work. (AR at pp. 21-22). This is a specific and legitimate reason for rejecting Dr. Forster's opinions and it is supported by substantial evidence. There is no doubt, as Plaintiff asserts, that MRIs show the Plaintiff has multi-level degenerative disc disease, multi-level central disc protrusion in the lumbar spine, and degenerate facet arthrosis at several levels. (AR at p. 216 and p. 243). Nevertheless, Dr. Forster's examination findings were "unremarkable" in that they did not reveal any significant physical limitations arising from that condition. Moreover, Dr. Forster suggested it was really the specialists at the pain clinic who were in the best position to evaluate the severity of plaintiff's pain and resulting limitations.

Furthermore, to the extent Dr. Forster relied on Plaintiff's statements in formulating his opinions, the ALJ's conclusion that those statements were unreliable because of Plaintiff's "drug seeking behavior, misuse of pain medication, pain contract violations and secondary gain motivation" (AR at p. 22), is supported by substantial evidence and was another specific and legitimate reason for according little weight to Dr. Forster's opinions. As is apparent, Dr. Forster commented about Plaintiff's drug seeking behavior and misuse of pain medication and there is significant additional evidence of this, as discussed *infra*.

### B. Jeremy Ginoza, D.O.

In July of 2010, Plaintiff saw Dr. Ginoza at Central Washington Family Medicine for arm pain. Plaintiff reported that in April 2010, he was moving a refrigerator on a dolly when it fell and landed on his right arm. Plaintiff refused to enter a pain contract in order to continue taking tramadol, stating he would prefer nonaddictive pain medications. He indicated he was using marijuana occasionally. (AR at p. 331).

///

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 9**

In August 2010, Plaintiff reported he was experiencing back pain after "throwing out his back three weeks ago lifting a heavy gate." Dr. Ginoza indicated that Plaintiff had "a pressure type low back pain, worse on the left" that was "actually gradually getting better." (AR at p. 329).

In September 2010, Plaintiff saw Dr. Ginoza for follow up on his chronic back pain. Plaintiff indicated he wanted to start on a pain contract in order to allow him to take narcotic pain medication stronger than tramadol. Plaintiff admitted to past marijuana and methamphetamine use, but stated he was committed to staying clean and taking only prescribed medication. (AR at p. 327). The pain contract was established at a later appointment in September 2010, at which time Plaintiff stated he stopped using marijuana 6 to 8 weeks ago. (AR at p. 326).

In October 2010, Plaintiff saw Dr. Ginoza for follow up on chronic pain. On his own initiative, Plaintiff was getting into outpatient treatment for methamphetamine use, his last use of the same having occurred the day before, according to him. Plaintiff indicated he was still using marijuana occasionally.

In November 2010, Plaintiff reported having good pain relief with lidocaine patches, his mood was pretty good and he recently put up Christmas decorations for the first time in four years. (AR at p. 321).

Dr. Ginoza saw the Plaintiff on January 27, 2011. Plaintiff was complaining of headaches since falling recently and hitting his head on a concrete sidewalk. He reported that he was carrying a loveseat into the house and tripped over a yard decoration. (AR at p. 319).

Plaintiff had been scheduled for followup on February 4, 2011 regarding his head injury, but CT results of his head were negative, he was having no more headaches, and his concentration and memory were normal. Instead, his concern was now directed at the pain he was experiencing in both knees. Examination of the knee

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 10**

and x-rays of the knee led Dr. Ginoza to diagnose bilateral patellofemoral syndrome[1] with possible patellar subluxation.[2] The doctor prescribed knee braces and physical therapy. (AR at pp. 317-18).

Five days later, on February 9, 2011, Plaintiff saw Dr. Ginoza "for pain in his upper abdomen worse since moving boxes and playing with his 40 pound dog last Friday, five days ago." (AR at p. 316). As it turned out, Plaintiff was suffering from cholecystitis (gallbladder inflammation) and would have his gallbladder removed on March 1, 2011. (AR at pp. 313-15).

On May 5, 2011, Plaintiff saw Dr. Ginoza to follow up on his cholecystectomy (gallbladder removal). Plaintiff reported that his "right abdomen has been sore and he thinks he pulled a muscle by overdoing it when he made a canopy and his dogs jumped on his stomach." (AR at p. 310).

On May 19, 2011, Plaintiff reported that he was free of abdominal pain and now wanted to do something for his chronic back pain which did not bother him as much when he had the abdominal pain, but was again an issue because the lidocaine patches were no longer relieving that pain. (AR at p. 308).

On May 23, 2011, Plaintiff was seen at Central Washington Family Medicine by Jillian Vetsch-Calhoun, PA-C. Plaintiff presented with low back pain, "stating

---

[1] Pain in the front of the knee sometimes caused by wearing down, roughening, or softening of the cartilage under the kneecap. http://www.webmd.com/pain-management/knee-pain/tc/patellofemoral-pain-syndrome-topic-overview

[2] Temporary, partial dislocation of the kneecap from its normal position in the groove in the end of the thigh bone (femur).http://www.summitmedicalgroup.com/library/adult_health/sma_subluxing_kneecap/

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 11**

that he went to pick something up over the weekend and pulled something in his back and [his] pain is worse." Plaintiff indicated it was the same type of pain he usually had and requested medication for it. Plaintiff "jumped off the table and stormed out of the room" when the PA-C told him she would not be giving him pain medication. The PA-C indicated that Plaintiff's gait was "normal and fast." (AR at pp. 307-307A). According to the PA-C, she advised the Plaintiff he had violated his pain contract by using methamphetamine and needed to discuss pain medication refills with his primary care physician (presumably Dr. Ginoza). (AR at p. 307A).

Plaintiff saw Dr. Ginoza again in July 2011. Plaintiff reported constant pain in his mid to left low back and in his left hip. The pain was "worse with activity" and "has been giving him more problems when doing yardwork (sic) lately." He showed Dr. Ginoza some paperwork indicating he had "Category 2" lumbar disease per the Washington Department of Labor and Industries (L & I). (AR at p. 499). Dr. Ginoza recorded the following results from his musculoskeletal examination of Plaintiff:

> [S]pinal range of motion - - flexes to almost 90 degrees with slow return to neutral, (sic) extension, sidebending and rotation are within normal limits (sic) patellar and ankle reflexes are 1/4 bilaterally (sic) Strength intact in the lower extremity by toe and heel raise and squat testing

(AR at p. 499).

On August 5, 2011, Dr. Ginoza indicated that Plaintiff's spinal range of motion was within normal limits. (AR at p. 498). On August 22, 2011, the doctor completed a "Medical Questionnaire" prepared by Plaintiff's attorney at the time in which the doctor opined that Plaintiff was limited to "sedentary" work. (AR at p. 496).

On September 27, 2011, Plaintiff returned to Dr. Ginoza "with a few things on his mind[,] but no particular complaint today." Plaintiff reported that two weeks ago he had twisted his back at a family reunion, but was doing better and the pain was about gone. He told the doctor he had quit using methamphetamine two weeks ago
///

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT- 12**

and had not used marijuana for two months, but that he would like to look into pain pills for his chronic back pain. (AR at p. 497).

Like Dr. Forster's examination findings, Dr. Ginoza's examination findings were "unremarkable" in that they did not reveal any significant physical limitations arising from any of Plaintiff's physical conditions. This was a specific and legitimate reason supported by substantial evidence for according little weight to Dr. Ginoza's opinion that Plaintiff is limited to sedentary work. Furthermore, as the ALJ pointed out, a L & I Category 2 impairment under Washington Administrative Code (WAC) 296-20-280 is a "mild low back impairment, with mild intermittent objective findings." (AR at p. 22). This too was a specific and legitimate reason for discounting Dr. Ginoza's opinion.

More significantly, Plaintiff reported a variety of activities to Dr. Ginoza- lifting a refrigerator, lifting a heavy gate, carrying a loveseat, moving boxes and playing with his 40-pound dog, and making a canopy- that are inconsistent with an RFC limited to sedentary work. Finally, to the extent Dr. Ginoza relied on Plaintiff's subjective statements, his RFC opinion is appropriately discounted because of Plaintiff's drug seeking behavior, misuse of narcotic pain medication and inconsistent statements about illicit drug use. Dr. Ginoza was familiar with all of these issues from his interactions with Plaintiff, as well as Plaintiff's interactions with other staff members at Central Washington Family Medicine.

Considered separately, each of these constituted a specific and legitimate reason for discounting Dr. Ginoza's opinion. Considered in combination, however, they overwhelmingly constitute a specific and legitimate reason for discounting Dr. Ginoza's opinion.

**C. Matthew Johnson, M.D.**

Plaintiff was first seen at Summitview Family Medicine in November 2011.

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 13**

Plaintiff sought to transfer his care from Dr. Ginoza to Summitview Family Medicine. Plaintiff advised that he "never uses street drugs." Musculoskeletal examination by Lori Smith, M.D., revealed "[n]ormal muscle strength and tone bilaterally throughout." (AR at p. 504). The same was reported by Dr. Smith on December 1, 2011. (AR at p. 502).

The record indicates the earliest Plaintiff began seeing Dr. Johnson at Summitview Family Medicine was in December 2012. (AR at pp. 588-91). In the "Medical Report" prepared by Plaintiff's attorney which Dr. Johnson completed on May 23, 2014, he listed the diagnoses for Plaintiff as chronic low back pain, bilateral knee pain, right wrist pain, neck pain, depression, anxiety and COPD. He offered the CT scan of Plaintiff's lumbar spine from December 2011 as support for the diagnosis of chronic low back pain. (AR at p. 618). Dr. Johnson indicated that Plaintiff needed to lie down or elevate his legs two to three times during a week, that his medications caused side effects of fatigue and confusion, that regular and continuous work would worsen Plaintiff's pain, and that Plaintiff would miss four or more days of work per month due to his medical impairments. (AR at pp. 618-19). He opined that Plaintiff was limited to sedentary work. (AR at p. 619).

The ALJ offered specific and legitimate reasons supported by substantial evidence to discount Dr. Johnson's opinion. As the ALJ noted, Dr. Johnson's restrictions are not supported by his own treatment records from December 2012 to March 2014 (AR at pp. 569-90) which indeed "reveal superficial examinations and no specific examinations of the [Plaintiff's] spine or extremities." (AR at p. 23). As the ALJ also noted, when Dr. Johnson's colleague, Dr. Smith, examined the Plaintiff, the Plaintiff "exhibited a normal gait[,] as well as an intact sensation and normal muscle tone and strength throughout all extremities." (AR at p. 23).

In his decision, the ALJ also detailed how objective examination findings did not support the degree of bilateral knee pain, right arm pain, and neck pain asserted

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT- 14**

by him, nor the severity of the COPD asserted by him. (AR at p. 23). Plaintiff does not challenge the ALJ's reasoning with the same degree of detail, resorting instead to essentially a sweeping general contention that the objective examination findings were enough to establish a limitation to sedentary exertion (e.g., "[o]ther exam findings showed positive straight leg raise, borderline moderate/severe COPD, bilateral knee crepitus and patellar crepitus" at ECF No. 13, p. 15).

The activities performed by Plaintiff, as reported to Dr. Ginoza, serve to legitimately call into question Dr. Johnson's opinion that Plaintiff is limited to sedentary exertion, just as they called into question the same opinion by Dr. Ginoza.

And finally, and perhaps most significantly, Plaintiff does not challenge the ALJ's finding that Plaintiff lacked credibility regarding his complaints of pain due to his drug seeking behavior, misuse of narcotic pain medication and inconsistent statements about illicit drug use. Plaintiff told Dr. Smith in November 2011 that he "never" used street drugs, although this was clearly untrue as revealed by the records of Plaintiff's previous medical provider, Dr. Ginoza. Moreover, the Summitview Family Medicine records do not show that Plaintiff ever advised that he violated his pain medicine contract with Central Washington Family Medicine. A rational inference is that Plaintiff left Central Washington Family Medicine because of his inability to obtain narcotic pain medication there and transferred to a new provider in order to obtain such medication- and he eventually did so (hydrocodone). (AR at p. 570). To the extent Dr. Johnson relied on Plaintiff's statements of pain, and it appears he did so extensively, Plaintiff's lack of credibility is a specific and legitimate reason for according little weight to Dr. Johnson's opinion that Plaintiff is limited to sedentary exertion.

### D. Michael Gurvey, M.D.

Dr. Gurvey testified as a medical expert at the hearing conducted by ALJ

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 15**

Siderius on February 29, 2012. Dr. Gurvey is a board certified orthopedic surgeon. (AR at p. 681). He acknowledged that Disability Determination Services (DDS) opined that Plaintiff was limited to light work[3], but Dr. Gurvey's opinion, based on his review of the record at that time, was that Plaintiff would be limited to medium work.[4] (AR at pp. 682-83). Medium work is what ALJ Kennedy determined Plaintiff's physical RFC to be. Plaintiff is incorrect in asserting that Dr. Gurvey opined that Plaintiff was limited to light work.

### E. Christopher Clark, LMHC

In November 2008, Mr. Clark, a Licensed Mental Health Counselor with Central Washington Comprehensive Mental Health (CWCMH), completed a DSHS Psychological/Psychiatric Evaluation for the Plaintiff. Mr. Clark noted the Plaintiff did not report having received any mental health services and denied any chemical dependency problems. (AR at p. 202). Indeed, there are no records from CWCMH until August 2009, after both of the DSHS evaluations completed by Mr. Clark in November 2008 and May 2009. Notwithstanding the lack of a mental health record, Mr. Clark diagnosed Plaintiff with depression and anxiety causing a host of moderate and marked cognitive and social limitations. (AR at pp. 203-04). Mr. Clark's May

---

[3] Light work is defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) as the ability to lift and carry up to 20 pounds occasionally and up to 10 pounds frequently. It requires a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm or leg controls.

[4] Medium work is defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) as the ability to lift and carry up to 50 pounds occasionally and up to 25 pounds frequently. Persons who can do medium work can also do light and sedentary work.

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT- 16**

2009 DSHS evaluation also indicated no history of mental health services for the Plaintiff. (AR at p. 208). This time, he diagnosed the Plaintiff with pain disorder in addition to depression and anxiety. (AR at p. 209). He once again indicated that Plaintiff had a number of moderate and marked cognitive and social limitations including that his concentration, persistence and pace were poor and "probably worse since last assessment." (AR at p. 210).

As noted above, mental health therapists, such as Mr. Clark, are not "acceptable medical sources" for the purpose of establishing if a claimant has a medically determinable impairment. 20 C.F.R. §§ 404.1513(a) and 416.913(a). Jay M. Toews, Ed.D., was the first psychologist to evaluate the Plaintiff. His November 2009 evaluation of the Plaintiff included a clinical interview, a mental status assessment, a records review, and a Structured Interview of Malingered Symptoms (SIMS). Dr. Toews reported that Plaintiff "evaded discussion" about Doctor Kim's note indicating a positive urinalysis and a history of methamphetamine and marijuana use for pain. (AR at p. 261). According to Dr. Toews:

> [Plaintiff's] SIMS total score exceeds . . . 14, recommended as the cutoff score for suspecting exaggeration of psychiatric symptoms and malingering. Scores on four of five subscales exceeded the cutoff levels, suggesting he was deliberately exaggerating medical and psychiatric complaints, specifically neurologic complaints; affective disorders; psychotic symptoms; and memory problems. Results indicate a high probability the gentleman is malingering.
>
> In summary, [Plaintiff] presents with complaints of low back pain and left knee pain and complaints of anxiety attacks. He evidences no signs or symptoms of anxiety this evaluation. He has a history of methamphetamine and marijuana use, which he denied and evaded at this evaluation.
>
> He is cognitively intact and appears to function in the normal range of intelligence. Attention, concentration and memory are not impaired. . . .
>
> He is able to comprehend[] mildly complex instructions. He would be able to interact with coworkers and supervisors. He is capable of performing a wide range of routine and repetitive types of work activity. . . .

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT- 17**

(AR at p. 262).

Abdul Qadir, M.D., a psychiatrist with CWCMH, saw Plaintiff on September 1, 2009, but there is no indication this was formal psychiatric evaluation. Instead, it appears to have been a medication management/treatment plan. Dr. Qadir informed Plaintiff it would be difficult to treat his depression and anxiety because of his pain medication and substance use. Plaintiff informed Dr. Qadir he was unwilling to quit using pain medication and marijuana. (AR at p. 350). Dr. Qadir saw Plaintiff a number of times thereafter through June 2012. (AR at pp. 366-68, 369-71, 377-79, 386-88, 389-91, 396-98, 403-04, 508-09, 511-13, 514-16, 517-19 and 613-16). Dr. Qadir diagnosed depression and anxiety which the ALJ found to be "severe" medically determinable impairments, however the doctor never diagnosed pain disorder. The mental status exams performed by Dr. Qadir were consistently unremarkable and Dr. Qadir never offered an opinion about the extent of Plaintiff's cognitive and social limitations and how they might impact his ability to work. Mental status exams performed at CWCMH by Kathleen Mack, ARNP, and Shane Anderson, Pharm. D., after June 2012, were also unremarkable. (AR at pp. 595, 599, 603, 607 and 611).

The ALJ provided "germane" reasons for according no weight to the November 2008 and May 2009 opinions of Mr. Clark in light of the subsequent assessments by Dr. Toews and Dr. Qadir. (AR at pp. 24-25). The assessments by Dr. Qadir at CWCMH consistently refer to Plaintiff's continuing use of illicit substances- methamphetamine and marijuana- and how that worsened Plaintiff's depression and anxiety symptoms. In November 2013, Plaintiff acknowledged to Mr. Anderson at CWCMH that he was occasionally using marijuana because it was now legal (AR at p. 594). Asked at the June 12, 2014 hearing about the last time he used marijuana, Plaintiff responded that it was about 2010 or 2011, but the ALJ pointed out to Plaintiff that the record showed him admitting in November 2013 to continuing use

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT- 18**

of marijuana. (AR at p. 642-43). Plaintiff's drug seeking behavior, misuse of narcotic pain medication and inconsistent statements about illicit drug use were a "germane" reason for the ALJ to accord no weight to the November 2008 and May 2009 opinions of Mr. Clark.

**CONCLUSION**

Because the ALJ offered specific and legitimate reasons supported by substantial evidence to discount the opinions of Drs. Forster, Ginoza and Johnson[5], and because he offered germane reasons supported by substantial evidence to reject the opinion of Mr. Clark, he posed a proper and complete hypothetical to the VE. That hypothetical included physical and mental limitations which were supported by substantial evidence in the record and pursuant to which the VE opined that Plaintiff could perform his past relevant work and alternatively, other jobs existing in significant numbers in the national economy. ALJ Kennedy rationally interpreted the evidence and "substantial evidence"- more than a scintilla, less than a preponderance- supports his decision that Plaintiff is not disabled.

Defendant's Motion For Summary Judgment (ECF No. 14) is **GRANTED** and Plaintiff's Motion For Summary Judgment (ECF No. 13) is **DENIED**. The Commissioner's decision is **AFFIRMED**.

///
///
///

---

[5] "Specific and legitimate" is the standard since the opinions of these doctors were contradicted by Dr. Gurvey and by the opinion of DDS physician, Norman Staley, M.D. (AR at p. 291), affirming the November 2009 physical RFC assessment by Cheri Glore. (AR at pp. 282-90).

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT- 19**

**IT IS SO ORDERED.** The District Executive shall enter judgment accordingly and forward copies of the judgment and this order to counsel of record.

**DATED** this __18th__ day of August, 2017.

*s/Lonny R. Suko*

_____
LONNY R. SUKO
Senior United States District Judge

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT- 20